FILED ___ LODGED
___ RECEIVED ___ COPY

APR 3 0 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1
2 **Angel Michel Valles (Pro Se)**
112 East Fairmont Drive
3 Tempe, AZ 85282
info@vallescapital.com | (928) 233-1345
4
5 **UNITED STATES DISTRICT COURT**
6
**DISTRICT OF ARIZONA**
7
8
9
| | |
|---|---|
| **VALLES CAPITAL INC.,** | Case No.: Number  **CV25-01443-PHX-SPL** |
| Plaintiff, | |
| vs. | |
| **THE DEPOSITORY TRUST AND CLEARING CORPORATION (DTCC); BANK OF AMERICA, N.A.; WELLS FARGO BANK, N.A.; JPMORGAN CHASE BANK, N.A.; VISA INC.; MASTERCARD INC.; JANE STREET CAPITAL, LLC; CITADEL SECURITIES LLC,,** | **COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF** |
| Defendant | |

**INTRODUCTION**

1. Plaintiff Valles Capital Inc. ("Plaintiff", "Valles Capital" or "Direct Deposit Market") brings this action to redress the unlawful delay in market access, clearing infrastructure, and essential capital services necessary to operate as a compliant investment issuer. Defendants, through coordinated or parallel conduct, have delayed Plaintiff's participation in federally authorized securities offerings, impeded integration with custodial and settlement systems (including DTCC and affiliated banking

THIS DOCUMENT IS <u>NOT</u> IN PROPER FORM ACCORDING TO FEDERAL AND/OR LOCAL RULES AND PRACTICES AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE _LRCwr5.4_
(Rule Number/Section)

institutions), and imposed inequitable conditions not applied to similarly situated issuers operating under SEC Rule 506(c). These acts constitute violations of antitrust and restraint-of-trade statutes, materially impairing Plaintiff's ability to deploy Treasury-backed liquidity, serve the direct deposit market, and contribute to lawful national economic growth.

2.  Despite full regulatory compliance and an open-end fund structure anchored in U.S. Treasury Direct Zero Percent Certificates of Indebtedness, Plaintiff has been constructively deferred and obstructed from accessing critical financial infrastructure necessary for lawful market entry, because of coordinated or consciously parallel delaying conduct by Defendants and affiliated entities.

3.  Each Defendant maintains separate points of contact, operating without any authorization to act, resulting in the constructive obstruction and unlawful delay of Plaintiff's access to clearing, custody, and settlement services that are indispensable to competitive participation in U.S. capital markets.

4.  This action arises under Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14) for unlawful restraint of trade, refusal to deal, group boycott, monopolization, attempted monopolization, and unlawful tying arrangements.

**NATURE OF THE CASE**

5.  Plaintiff Valles Capital Inc. brings this action redresses the unlawful suppression of a Treasury-backed investment platform that, if allowed to operate without obstruction or delay, would immediately begin to strengthen national fiscal stability, materially increase GDP, and provide lawful, real-time liquidity access to the $18 trillion annual unallocated direct deposit market.

6.  Through stable, structured reinvestment of direct **payroll** deposits into U.S. Treasury-backed instruments, Plaintiff's platform would generate over $2 trillion annually in new federal capital gains revenues and redirect $2 trillion in US Payroll flows into $15 trillion in GDP contributive

capital circulation, sufficient to **stabilize or retire** substantial portions of existing U.S. sovereign debt obligations.

7.  The platform directly addresses the national fiscal deficit by expanding IRS-traceable capital gains tax bases, enhancing sovereign liquidity, and materially reducing the need for deficit-financed expenditures or the adoption of speculative cryptocurrencies.

8.  Defendants, acting through coordinated or consciously parallel conduct, have obstructed Plaintiff's lawful market entry while simultaneously promoting speculative, tax-obscured cryptocurrency ventures that divert capital away from Treasury-backed markets, destabilize lawful liquidity structures, and exacerbate national fiscal **vulnerabilities**.

9.  Had Plaintiff's Treasury-backed liquidity platform been allowed to operate without obstruction, it would have mobilized structured payroll deposit circulation, yielding new federal tax revenues through lawful, IRS-recognizable capital formation.

10. The damages sought herein, $273,300,000 multiplied across the seven principal Defendants, totaling approximately $1.9 trillion, are only slightly less than the leveraged payroll capital infusion necessary to achieve this tax revenue outcome.

11. Thus, the relief requested is not speculative or punitive but is directly proportionate to the quantifiable economic harm inflicted on Plaintiff and the direct deposit market by Defendants' coordinated restraint of trade, obstruction of Treasury-backed liquidity expansion, and material delay of GDP-contributive financial flows.

12. This ongoing restraint of trade has caused measurable economic injury, beginning with the post-2008 pricing out of U.S. payroll depositors from lawful US Treasury fund market participation, leaving them unable to adjust to an abrupt fed rate imposed by Bernanke.

13. This pricing continues through the present with the unlawful delay of a scalable, compliance-driven investment mechanism.

**14.** Defendants' obstruction has materially impaired the deployment of a Treasury-backed liquidity solution urgently required to stabilize sovereign debt funding, expand GDP-contributive capital formation, and preserve the structural integrity of U.S. financial markets.

**15.** Judicial intervention is therefore required not only to remedy Plaintiff's delayed market entry and economic harm, but to materially restore competitive access to stable Treasury-backed financial systems **beyond institutional only participation,** which is essential for lawful economic growth, tax revenue expansion, and sovereign debt reduction.

### PARTIES

16. Plaintiff Valles Capital Inc. is an Arizona corporation, incorporated in 2022, and an open-end management investment company registered with the SEC under Form N-1A (File Nos. 333-280698 / 811-23981).

17. Valles Capital operates under Rule 506(c), offering Infinity Series Shares, structured around Treasury securities and enabling real-time liquidity via debit card integration.

**Defendants include:**

    i.   The Depository Trust and Clearing Corporation (DTCC) and affiliates;

    ii.   Bank of America and other large commercial banks;

    iii.   Visa Inc., Mastercard Inc., and related payment processors;

    iv.   Jane Street, Citadel Securities and related Market Makers

    v.   Regulatory actors who enable legacy incumbents but obstruct new market entrants.

### JURISDICTION AND VENUE

18. Jurisdiction is proper under 15 U.S.C. §§ 4, 15, 26 and 28 U.S.C. §§ 1331, 1337.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 4 OF 22

19. Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391, as Defendants transact business and impact interstate commerce in this District.

### STANDING AND RIPENESS

20. Plaintiff has standing as a registered issuer with an active offering, documented in DTCC Case #10221466, and an ongoing business integration submission.

21. The claim is ripe. Plaintiff suffers a present injury, traceable directly to Defendants' delaying access to critical financial infrastructure, which is current, concrete, and causing ongoing economic harm.

22. No further factual development is necessary.

23. Further delays would irreparably prejudice Plaintiff's rights by compounding economic losses and perpetuating Plaintiff's inability to enter, participate in, and compete within essential capital markets.

24. Damages include blocked investor capital, delayed launches, reputational harm, and systemic obstruction.

### FACTUAL ALLEGATIONS

#### A. The Valles Capital Offering

25. The fund is anchored in Treasury-backed securities, enabling non-disruptive entry, point-of-sale redemption, plus Cost of Goods Sold and Capital Gains optimization.

26. Share classes offer varying leverages (**2:1 to 5:1**), targeting the direct deposit market with institutional-grade participation with transparent tax benefits.

27. Prior to initiating this action, Plaintiff Valles Capital Inc. made several good-faith efforts to engage with executive leadership to promote lawful Treasury-backed financial innovations aligned with national economic priorities.

28. On February 24, 2025, Plaintiff submitted a formal communication to the Office of the President of the United States proposing a structured, Treasury-integrated investment platform designed to strengthen GDP growth, reinforce sovereign debt stability, and expand lawful market access for the direct deposit market.

29. No response or engagement was received from the administration following this submission.

30. Despite this outreach and the demonstrated public benefits of Plaintiff's strategy, Defendants continued to obstruct Plaintiff's access to essential financial infrastructure.

31. Plaintiff's injuries arise solely from Defendants' private delaying conduct, not from any governmental denial or regulatory barrier.

32. Plaintiff's good-faith attempts to advance non-litigation remedies further underscore the public interest at stake and establish the necessity of judicial intervention to restore competitive conditions in Treasury-backed financial markets.

**B. Constructive Obstruction Despite Compliance**

33. Valles Capital submitted full integration documentation and clearing requirements to DTCC and intermediaries.

34. Yet, access to T+0 settlement, debit integration, and omnibus clearing have been withheld, without material regulatory objection.

**C. Inconsistent Access and Market Disparity**

35. Historically, financial institutions such as Bank of America delayed services to adult-oriented industries based on internal policy to develop internet protocols for pornography.

36. In response, alternative platforms including ventures associated with individuals such as Elon Musk, emerged to fill these service gaps and whose venture(s), increased 15:1 with Covid stimulus funds.

37. Defendants, responding to declining revenues following the 2008 financial crisis and the rise of Bitcoin have increasingly pivoted toward the active support of cryptocurrency ventures.

38. These ventures are widely recognized as carrying heightened systemic risks, including tax evasion, money laundering, regulatory evasion, and heightened monetary volatility.

39. Yet these peer-to-peer cryptocurrency ventures continue to receive institutional size backing, positioned as alternatives to escape market volatility while filling service gaps previously occupied by U.S. Treasury Direct instruments and traditional US Treasury money market funds.

40. This strategic shift by Defendants actively undermines the integrity of Treasury-backed financial structures and replaces lawful, compliance-driven liquidity mechanisms with unregulated, speculative alternatives that evade traditional financial safeguards.

41. At the same time, Defendants have delayed, obstructed, and arbitrarily withheld from Plaintiff access to Treasury-backed financial infrastructure necessary for lawful market entry under Regulation D and SEC Form N-1A filings.

42. This disparate treatment constitutes an unjust denial of critical infrastructure access, systematically undermining lawful, Treasury-aligned financial entry in favor of speculative crypto-based alternatives that serve private and institutional gain at significant public expense.

43. The financial systems that once enabled prior legacy market entrants have since become fragmented, uncoordinated, and increasingly subject to discretionary enforcement practices that favor incumbent participants while excluding new, compliant competitors.

44. As a direct result, Plaintiff has been constructively and unlawfully delayed from entering and participating in a materially underserved and growing $18 trillion direct payroll deposit market.

45. Upon information and belief, Defendants cannot establish any legitimate procompetitive justification for their conduct, which instead constitutes a pattern of coordinated delays, denials, and strategic obstructions designed to suppress competition and obstruct over $18 trillion annually in new payroll-backed market entry and associated $100 trillion in new capital formation.

### D. Public Interest and National Financial Stability

46. Plaintiff's investment strategy strengthens national liquidity by expanding the circulation of Treasury-backed instruments and enabling IRS-recognized tax deductions and reportable capital gains contributions, directly supporting national economic growth.

47. Defendants' obstruction of Plaintiff's lawful market access undermines the circulation of these Treasury-backed instruments, restricts lawful capital flows, and increases the cost of servicing the national debt by suppressing tax revenue from Treasury-based investment opportunities.

48. In addition, Defendants' unlawful delays impose avoidable tax burdens on approximately 70% of the direct deposit market and obstruct the activation of over $18 trillion annually in new, GDP-contributive capital formation.

49. Defendants' preferential promotion of speculative cryptocurrency systems has materially and foreseeably destabilized the national fiscal infrastructure, diverting lawful liquidity flows into unregulated and tax-obscured channels.

50. These distortions are reflected in the proliferation of bait-and-switch personas, speculative financial products, and public workforce reductions orchestrated by market participants whose operations include significant cryptocurrency exposure.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 8 OF 22

51. Such market participants simultaneously benefit from federally hedged infrastructures while promoting high-risk, decentralized alternatives that erode the stability of the broader financial ecosystem.

52. Cryptocurrency systems now divert trillions of dollars in capital annually from regulated markets, displacing Treasury-backed, IRS-traceable financial instruments with decentralized, opaque, and frequently tax-evading alternatives.

53. The net result is a materially weakened national liquidity framework, reduced tax compliance, and growing systemic instability originating from regulatory policy vacuums and service gaps exposed during the 2008 financial crisis.

54. Judicial intervention is therefore necessary to ensure open and equitable access to U.S. sovereign debt markets, protect stable Treasury-backed financial systems, and restore competitive integrity to essential capital infrastructure.

55. Treasury-backed investment mechanisms, when paired with omnibus clearing infrastructure anchored in U.S. Treasury instruments, serve the public interest by reinforcing lawful financial participation, enhancing fiscal stability, and promoting GDP-contributive liquidity.

56. Plaintiff's strategy, if fully deployed, would provide a secure, transparent, and scalable $18 trillion foundation for equitable $100 trillion market participation, sovereign debt support, and enduring national economic resilience.

**E. The Direct Payroll Deposit Market is Material and Obstructed**

57. U.S. payroll flows exceed $27 trillion annually (source: Bureau of Economic Analysis), yet less than one-third of these flows are currently directed toward structured fund investments at the point of deposit, representing a substantial, materially underserved market opportunity.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 9 OF 22

58. The materially underserved direct deposit market, representing over $18 trillion in annual U.S. payroll flows, is ready to absorb and utilize Treasury-backed, debit-based investment products designed to offer real-time liquidity, tax advantages, and sovereign asset security.

59. Plaintiff's platform uniquely addresses this unmet demand by providing a lawful, compliant alternative to unregulated cryptocurrency systems, offering working families and institutional investors access to secure, GDP-contributive financial products directly at the point of deposit.

60. The readiness of the market further underscores the competitive harm caused by Defendants delayed obstruction and the urgent need for judicial relief to restore open market access to Treasury-backed financial infrastructure.

61. Plaintiff's platform, operated through Valles Capital Inc., is specifically designed to convert direct payroll deposits into leveraged, Treasury-backed investment equity in real time, while simultaneously providing zero-risk debit card liquidity to participants, thereby aligning lawful capital formation with immediate liquidity needs.

62. Through its Automated Market Maker (AMM) Omnibus Account structure, Plaintiff's platform generates IRS-recognizable Cost of Goods Sold deductions and capital gains contributions, while materially expanding GDP by channeling payroll and investment flows into traceable, Treasury-backed, economically productive activity that directly supports sovereign debt markets and national fiscal stability.

**F. Public Interest Justification for Judicial Intervention**

63. Judicial intervention in this case serves not only to vindicate Plaintiff's individual rights but also critical public interests tied to national economic stability, tax compliance, and sovereign debt management.

64. Plaintiff's Treasury-backed AMM platform directly strengthens the lawful circulation of U.S. Treasury instruments by providing real-time liquidity to working families while simultaneously generating IRS-recognizable tax deductions and capital gains taxes.

65. These structured financial flows materially **increase reported taxable income**, thereby supporting federal revenue generation, lawful capital formation, and sustained economic growth.

66. Based on Bureau of Economic Analysis data, annual U.S. payroll flows exceed $27 trillion. Plaintiff's platform is specifically designed to redirect approximately 5% of these flows—equal to $1–2 trillion annually—into structured, GDP-contributive investments.

67. By doing so, the platform could generate an estimated $2.25 trillion in additional federal tax revenues each year, materially strengthening the sovereign fiscal base of the United States.

68. In sharp contrast, Defendants' obstruction of Plaintiff's market access while simultaneously promoting high-risk, tax-obscured cryptocurrency ventures and pricing out direct depositors' lawful entry to liquidity structures, increases systemic financial risk, and actively erodes the Treasury-backed foundations of U.S. economic infrastructure.

69. Therefore, prompt judicial relief is necessary not only to prevent ongoing and irreparable harm to Plaintiff but also to safeguard the broader public interest in preserving a transparent, tax-compliant, and Treasury-aligned financial system that directly contributes to GDP expansion, fiscal resilience, and economic sovereignty.

### National Scalability and Public Interest Statement

70. Full-scale implementation of Plaintiff's Treasury-backed AMM Omnibus platform has the potential to redirect sufficient payroll and investment flows to generate an estimated $2.25 trillion from 15% Capital Gains annually in new federal tax revenues.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 11 OF 22

71. Based on current sovereign debt levels, the national economy would require approximately $15 trillion in structured, GDP-contributive capital **circulation** to fully stabilize or retire outstanding U.S. debt obligations through lawful, IRS-recognizable financial flows.

72. Plaintiff's strategy is uniquely aligned with national fiscal interests, offering a scalable, compliant alternative to speculative decentralized finance systems. Defendants' unlawful delay of Plaintiff's market access not only suppresses competition in the stable Treasury-backed investment sector but also materially delays the public's opportunity to participate in sovereign debt reduction through transparent, tax-compliant investment mechanisms.

73. Judicial intervention is necessary to **eliminate this restraint of trade**, restore competitive conditions, and protect the structural integrity of U.S. fiscal and financial systems.

### Historical Context and Public Interest Legacy

74. The issues raised in this action echo historical warnings about the dangers of private financial concentration corrupting public institutions.

75. In 1934, Major General Smedley Butler, a two-time Medal of Honor recipient, testified before Congress about the "Business Plot of 1933", a conspiracy by powerful financial actors to overthrow the elected U.S. government in favor of a corporate-controlled regime.

76. In his writings, including *War is a Racket* (1935), Butler described how entrenched financial interests often subordinated public welfare to private profit, using political and economic systems to entrench their control at the expense of open democratic participation.

77. This pattern continued after World War II, directly or indirectly influencing the Act of 1940, as elements of the global financial system rehabilitated and reintegrated economic actors who had profited from or supported authoritarian regimes, prioritizing capital continuity over ethical accountability.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 12 OF 22

78. Certain banking institutions and capital networks with known fascist affiliations were quietly reabsorbed into Western finance.

79. Plaintiff's Treasury-backed Automated Market Maker platform stands in direct contrast to these historical patterns. Plaintiff offers the direct deposit market a transparent, tax-compliant, sovereign-aligned investment model that strengthens U.S. Treasury liquidity, enhances federal tax revenue, and supports national economic resilience.

80. Defendants' unlawful obstruction of Plaintiff's market access perpetuates the same structural injustices Butler warned against:

    1.   favoring incumbent financial actors,

    2.   undermining lawful competition, and

    3.   subordinating the public fiscal interest to private institutional control, today's reality.

81. Judicial intervention is not merely necessary to vindicate Plaintiff's individual rights; it is essential to restore and open, competitive integrity to stable Treasury-backed financial systems, protect the national fiscal foundation, and **prevent the recurrence** of historically discredited patterns of financial nepotism and financial harm.

## LEGAL CLAIMS

### COUNT I — Conspiracy to Restrain Trade (Sherman Act §1)

82. Defendants engaged in tacit, parallel conduct or express coordination to deny Plaintiff access to vital market infrastructure (Twombly).

83. Areas of obstruction include:

    i.   DTCC clearing and fund tracking;

    ii.   Custody and safekeeping of Regulation D securities;

       iii.   Payment settlement support (Visa/Mastercard);

       iv.   Bank onboarding for debit-linked share classes.

### COUNT II — Monopolization / Attempted Monopolization (Sherman Act §2)

84. Defendants maintain a monopoly over U.S. capital infrastructure and have used this dominance to suppress new entrants (Twombly and Grinnell).

85. Plaintiff's non-disruptive, lower-cost capital model posed no threat to legacy margins and yet was persistently obstructed.

### COUNT III — Unlawful Tying / Exclusive Dealing (Clayton Act §3)

86. Access to clearing, custody, or registration services was conditioned on:

    A.   Accepting informal threats of criminal review;

       i.   Defendants have unlawfully conditioned Plaintiff's access to essential financial infrastructure on extralegal and coercive requirements, including the retention of outside legal counsel, acquiescence to informal threats of criminal referral, and abandonment of Plaintiff's Treasury-backed, IRS-compliant investment model filed under SEC Rule 506(c).

       ii.   This conduct constitutes an illegal tying arrangement under Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2 (1984), and violates Section 3 of the Clayton Act, 15 U.S.C. § 14. Defendants possess market power in the tying product market and have used that power to impose conditions that unlawfully obstruct competition in the tied market of exempt investment fund offerings.

       iii.   Hiring external legal counsel is not required by law.

87. As established in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), the Clayton Act prohibits tying and exclusive dealing arrangements that substantially lessen competition.

88. Forgoing new capital strategies not pre-approved by legacy actors (Tampa Electric).

89. Here, the coercive conditions imposed by Defendants have effectively prevented an innovative Treasury-based capital model from competing in the exempt offering market, harming not only Plaintiff but also the broader public interest in open, tax-compliant, and secure financial alternatives.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

- Declare Defendants' conduct unlawful under 15 U.S.C. §§ 1, 2, and 14;

- Grant preliminary and permanent injunctions barring the inequitable refusal of Plaintiff from market infrastructure;

- Award damages exceeding $273,300,000, subject to trebling under 15 U.S.C. §15;

- Award treble damages, attorneys' fees, expert costs, and costs of suit;

- Grant such other relief as the Court deems just and proper.

**Trebled Damages as Liquidity Backstop for the Direct Deposit Market**

1. Trebled damages awarded in this action would serve not merely to compensate Plaintiff Valles Capital Inc. for injuries suffered but would function as a strategic liquidity backstop for the broader direct deposit market.

2. Specifically, the damages—when reinvested through Plaintiff's Treasury-backed Automated Market Maker Omnibus platform—would provide an immediate, transparent, and tax-compliant capital reserve capable of absorbing real-time payroll deposits and supporting Treasury-aligned market entry for millions of underserved participants.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 15 OF 22

3. This reinvestment would:

    a. Stabilize capital flows into U.S. Treasury-backed investment vehicles at the point of deposit, reducing systemic reliance on speculative, tax-obscured alternatives;

    b. Enable real-time liquidity access for working families via debit card-linked Treasury-backed equity accounts;

    c. Expand national GDP by transforming passive payroll flows into structured, taxable investment contributions;

    d. Reinforce sovereign debt markets by directly increasing demand for Treasury instruments;

    e. Protect the national fiscal infrastructure against continued erosion from cryptocurrency-based displacement and **tax base attrition**.

4. Thus, the treble damages would not merely repair the private harm suffered by Plaintiff, but would materially advance public interests by providing a scalable, sovereign-secured liquidity foundation for over $18 trillion annually in direct deposit flows.

5. In this way, the relief sought would both restore competitive conditions and safeguard national economic stability.

Respectfully Filed by,


Angel Michel Valles (Pro Se)
CEO, Valles Capital Inc.
Date: Wednesday, April 30, 2025

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF -
PAGE 16 OF 22

## PROPOSED ORDER GRANTING INJUNCTIVE RELIEF

Having reviewed the pleadings, declarations, and evidence presented, the Court finds that:

Plaintiff has demonstrated a likelihood of success on the merits, the risk of irreparable harm, the absence of adequate alternative remedies, and that injunctive relief serves the public interest.

**IT IS HEREBY ORDERED:**

**I. PRELIMINARY AND PERMANENT INJUNCTION**

**1.** Defendants are hereby enjoined from directly or indirectly delaying, denying, conditioning, or obstructing Plaintiff's access to:

- a. DTCC clearing and settlement infrastructure;
- b. Custody services for securities issued under Regulation D, Rule 506(c);
- c. Banking integration for debit-linked redemptions and point-of-sale liquidity functions;
- d. Financial services on the basis of unfiled administrative actions or the absence of retained outside counsel.

**2.** The U.S. Securities and Exchange Commission shall issue a written determination within fourteen (14) days of this Order, clarifying Plaintiff's standing to offer exempt securities under Form N-1A and Rule 506(c) of the Securities Act of 1933.

**3.** Bank of America, N.A., and its affiliates shall process Plaintiff's custody and debit-linked redemption transactions on terms no less favorable than those afforded to other Rule 506(c) issuers.

**II. DAMAGES**

**4.** Plaintiff is awarded preliminary damages totaling $273,300,000, itemized as follows:

- a. $12,000,000 in lost capital access.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 17 OF 22

- b. $260,000,000 in delayed Treasury-backed annual trading vol.

- c. $1,300,000 in annual fund management losses.

**5.** Plaintiff is further authorized to pursue treble damages exceeding $150,000, including:

- a. Recovery of lost fund fees;

- b. Expert witness costs;

- c. Attorneys' fees, to date $80,000;

- D. Cost of suit $70,000;

**6.** Total equitable relief and statutory remedies, when trebled pursuant to 15 U.S.C. § 15 and inclusive of attorneys' fees and expert costs, **may exceed $450,000**.

**III. COURT SUPERVISION**

**7.** The Court shall retain continuing jurisdiction over this matter for enforcement, compliance, and relief administration, including resolution of any further motions for damages, attorneys' fees, or injunctive relief.

**8.** Defendants are ordered to provide all necessary support and access to financial infrastructure, including but not limited to clearing services, custody arrangements, and payment processing.

**SO ORDERED.**

DATED this _____ day of _____, 2025.

UNITED STATES DISTRICT JUDGE

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 18 OF 22

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## CIVIL COVER SHEET (JS 44)

**Plaintiff:**

Valles Capital Inc.
112 East Fairmont Drive
Tempe, AZ 85282
Telephone: (928) 233-1345
Email: info@vallescapital.com

**Defendants:**

The Depository Trust and Clearing Corporation (DTCC)

Bank of America, N.A.

Visa Inc.

Mastercard Inc.

Wells Fargo Bank, N.A.

JPMorgan Chase Bank, N.A.

Jane Street Capital, LLC

Citadel Securities LLC

**Basis of Jurisdiction:**

☒ Federal Question (U.S. law – Sherman Act, Clayton Act)

**Nature of Suit:**

Antitrust – 410

**Origin:**

☒ Original Proceeding

**Cause of Action:**

15 U.S.C. §§ 1, 2 (Sherman Act); 15 U.S.C. § 14 (Clayton Act) – Restrictive conduct, monopolization, group boycott.

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF - PAGE 19 OF 22

**Requested Relief:**

Injunctive relief, treble damages, attorneys' fees, compliance order.

**Jury Demand:**

☒ Yes

**Signature of Attorney or Pro Se Party:**

Angel Michel Valles (Pro Se)

Date: April 18, 2025

1

# SUMMONS IN A CIVIL ACTION (AO 440)

2

TO:

3

4
- **Chief Legal Officer**
  The Depository Trust and Clearing Corporation (DTCC)

5
  55 Water Street, New York, NY 10041

6
- **General Counsel**
  Bank of America, N.A.

7
  100 N. Tryon Street, Charlotte, NC 28255

8
- **Registered Agent**
  Visa Inc.

9
  900 Metro Center Blvd., Foster City, CA 94404

10
- **Registered Agent**
  Mastercard Inc.
  2000 Purchase Street, Purchase, NY 10577

11

12
- **Wells Fargo Bank, N.A.**
  c/o Corporation Service Company

13
  2730 Gateway Oaks Drive, Suite 100
  Sacramento, CA 95833

14
  Email: subpoenafax@wellsfargo.com

15
- **JPMorgan Chase Bank, N.A.**
  c/o CT Corporation System

16
  111 Eighth Avenue, 13th Floor
  New York, NY 10011

17
- **Jane Street Capital, LLC**
  United Corporate Services, Inc.

18
  800 North State Street, Suite 304
  Dover, DE 19901

19
- **Citadel Securities LLC**
  CT Corporation System

20
  1200 South Pine Island Road

21
  Plantation, FL 33324

22

You are hereby summoned and required to serve on:

23

24
**Angel Michel Valles**
Valles Capital Inc.

25
112 East Fairmont Drive
Tempe, AZ 85282

26
info@vallescapital.com | (928) 233-1345

27

28
COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, THE CLAYTON ACT, AND RELATED RELIEF -
PAGE 21 OF 22

an answer to the complaint which is served on you with this summons within 21 days after service of this summons on you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**Clerk of the Court:**

Date: _____

Signature of Clerk or Deputy Clerk: _____

**NOTICE TO THE COURT:**

Plaintiff Valles Capital Inc. respectfully submits this Civil Cover Sheet and Summons package in connection with its initial complaint for violations of the Sherman Act and Clayton Act.

**Filed by:**
Angel Michel Valles (Pro Se)
CEO, Valles Capital Inc.
Date: Wednesday, April 30, 2025